**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CASE NO.:**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT E. LANE, | ) |
| WEALTH POOLS INTERNATIONAL, INC., and | ) |
| RECRUIT FOR WEALTH, INC., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| T-N-T EDUCATION COMPANY, INC., | ) |
| RICHARD H. LANE, | ) |
| MUNDO TRADE, INC., | ) |
| RENEE BECKER, | ) |
| JULIA LANE, and | ) |
| FIRST FIDUCIARY BUSINESS TRUST, | ) |
| | ) |
| Relief Defendants. | ) |
| | ) |

6:07-CV-1920- 18KRS

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission alleges as follows:

**I.     INTRODUCTION**

1.     The Commission brings this action to enjoin Defendants Wealth Pools International, Inc., Recruit for Wealth, Inc. (collectively "Wealth Pools"), and Robert E. Lane (collectively "Defendants") from continuing to defraud investors through a fraudulent pyramid scheme primarily targeting the Hispanic community.  For more than two years, Lane, a securities

recidivist, and his companies, Wealth Pools, have offered securities in the form of investment contracts in violation of the registration and antifraud provisions of the federal securities laws.

2.      The Defendants are violating Section 5 of the Securities Act of 1933 ("Securities Act") by offering and selling unregistered investment contracts.  Wealth Pools purports to be a multi-level marketing company primarily selling an English and Spanish language tutorial DVD called Talk-N-Tutor through a network of sales Associates around the world.  The DVD is, in reality, a front for Wealth Pools' true product – an investment in one or more "pools" that offer investors an opportunity to receive passive income through the efforts of the Defendants to recruit new investors.  Investors do not profit from the sale of DVDs to consumers, but from Wealth Pools recruiting new investors termed "Associates."  These Associate memberships qualify as a security as defined by the federal securities laws.  Wealth Pools claims to have sold more than $132 million worth of Associate positions to at least 70,000 people from at least 64 countries, but has never filed a registration statement with the Commission.

3.      In connection with the offer and sale of the unregistered investment contracts, the Defendants are violating the antifraud provisions of the federal securities laws by making numerous material misrepresentations and omissions.  For example, the Defendants fail to disclose that Wealth Pools is a pyramid scheme utterly dependent on an ever increasing number of new investors to pay existing ones, and is destined to collapse, leaving investors with substantial losses.  The Defendants also do not disclose the dilutive effect of new investors on all investors' returns, which renders baseless their claim that 97% of Associates make money and receive a lifetime of passive income.   The Defendants also utterly fail to disclose that Lane was president of another company that used similar methods that failed, resulting in it declaring bankruptcy and being enjoined by the State of Florida.

2

4.     The Commission seeks permanent injunctive and other relief.  Because the Defendants continue to solicit investors and hold investors' funds, the Commission seeks emergency relief, including a temporary restraining order, preliminary injunction, and asset freeze, to prevent the further dissipation of investors' assets.

## II.     DEFENDANTS AND RELIEF DEFENDANTS

### A.     Defendants

5.     Defendant Robert Lane ("Lane"), age 69, resides in Orlando, Florida and is the founder, president, and 100% owner of Wealth Pools International and Recruit for Wealth.  In July 1990, the United States District Court for the Western District of Pennsylvania permanently enjoined Lane from violating the registration and antifraud provisions of the federal securities laws based on another fraudulent and unregistered offering of securities in a company he controlled where he misappropriated a substantial portion of the offering proceeds for his personal use.  Also in July 1990, the Commission barred him from association with any broker, dealer, municipal securities dealer, investment adviser, or investment company.  During the Commission's investigation of this matter, Lane asserted his Fifth Amendment privilege against self-incrimination to each and every substantive question posed to him regarding Wealth Pools' fraudulent securities offering.

6.     Defendant Wealth Pools International is a private company, incorporated in Delaware, with its principal place of business in Orlando, Florida.  Wealth Pools International has never been registered with the Commission in any capacity and has never registered any offering of securities under the Securities Act or any class of securities under the Securities Exchange Act of 1934 ("Exchange Act").

7.     Defendant Recruit for Wealth is a private company, incorporated in Nevada, with its principal place of business in Orlando, Florida. In April 2007, Recruit for Wealth registered with the State of Florida to do business as "WealthPools." Recruit for Wealth has never been registered with the Commission in any capacity and has never registered any offering of securities under the Securities Act or any class of securities under the Exchange Act.

**B.     Relief Defendants**

8.     Relief Defendant Richard H. Lane, age 65, resides in Mobile, Alabama, and is the president and director of T-N-T Education. Richard Lane is Lane's brother. During the Commission's investigation of this matter, Richard Lane asserted his Fifth Amendment privilege against self-incrimination to each and every substantive question posed to him regarding Wealth Pools' fraudulent securities offering. The Defendants have transferred investors' funds into at least one bank account Richard Lane holds.

9.     Relief Defendant T-N-T Education Company, Inc. is a private company incorporated in Delaware with its principal place of business in Mobile, Alabama. T-N-T Education purportedly produces the Talk-N-Tutor DVDs for Wealth Pools. Richard Lane is the president and director of T-N-T Education. The Defendants have transferred investors' funds into a bank account T-N-T Education holds.

10.    Relief Defendant Mundo Trade, Inc. is a private company, incorporated in Nevada, with its principal place of business in Alabama. Richard Lane is its president and Lane is its secretary and treasurer. Defendants transferred investors' funds into a bank account Mundo Trade holds.

11.     Relief Defendant Renee Becker, age 31, resides in Orlando, Florida, and is Lane's daughter.  She works for Wealth Pools.  Investors' funds were directly deposited into bank accounts she holds jointly with Wealth Pools.

12.     Relief Defendant Julia Lane, age 52, is believed to be Lane's wife and lives with him in Orlando.  She holds at least one joint bank account with Lane.  The Defendants have transferred investors' funds into this joint bank account.

13.     Relief Defendant First Fiduciary Business Trust is a domestic business trust organized under the laws of Nevada with its principal place of business in Mount Dora, Florida. Lane is a signatory on at least one of its bank accounts and the Defendants have transferred investors' funds into a bank account First Fiduciary holds.

III.    **JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

15.     Venue is proper in the Middle District of Florida because many of the Defendants acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Middle District of Florida.  Furthermore, Lane resides in the Middle District of Florida, and the principal offices of Wealth Pools are located in the Middle District of Florida.  Venue is proper as to the Relief Defendants because they all received investors' funds from bank accounts located in the Middle District of Florida.  Also, Relief Defendants Renee Becker and Julia Lane reside in the Middle District of Florida.

16.     The Defendants, directly and indirectly, singly or in concert with others, have made use of the means and instrumentalities of interstate commerce, the means and instruments

of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

## IV.   DEFENDANTS OFFERED AND SOLD AN UNREGISTERED SECURITY

### A.   Wealth Pools' Offering

17.     From at least August 2005 through the present, Wealth Pools has offered and sold unregistered securities in the form of "Associate" memberships in a pyramid scheme, and claimed to have raised at least $132 million from investors worldwide.   The Defendants primarily offer Associate memberships through Wealth Pools' publicly available website and word-of-mouth.   Many of the Associate memberships are purchased by members of the Hispanic community in Orlando, Florida, Puerto Rico, and Central American countries such as Panama. Moreover, Wealth Pools solicits investors in part through "Opportunity Meetings" broadcast on the internet from its headquarters in Orlando, and encourages Associates to bring prospective investors to these meetings.   Prospective investors can also listen to the meetings via teleconference.

18.     Wealth Pools International and Recruit for Wealth are ostensibly separate companies; however, in reality, they operate as a single entity, making an integrated offering of securities, and are used interchangeably in the online application to become a Wealth Pools Associate.

19.     Wealth Pools claims it is a multi-level marketing company centered on the sale of a language tutorial DVD through a worldwide network of sales Associates.   Wealth Pools claims to be the exclusive distributor of a revolutionary language tutorial DVD called Talk-N-Tutor "that has made learning English or Spanish a breeze."   Richard Lane produced Talk-N-Tutor

through his company T-N-T Education. Wealth Pools sells Talk-N-Tutor and an Associate Position for $199.95.

20.     Recently, in order to further mask their scheme, Wealth Pools has begun offering additional products, including a U.S. Citizenship Freedom Pack to its Talk-N-Tutor DVD and a non-Food and Drug Administration regulated "fat blocker." None of these additional products changes the Defendants' true product -- an investment contract to receive passive income from one or more "pools."

21.     In reality, the Talk-N-Tutor DVD is a far cry from being revolutionary. It teaches only very rudimentary language skills, both the English and Spanish tutorials are each only thirty minutes long, and its price is considerably greater than comparable programs on the market. Moreover, the program is full of misspellings and grammatical errors. For example, Wealth Pools' former vice president and marketing director testified he attempted to sell the DVD to the State of Florida for use in its school system but was unsuccessful. A school official sent him a letter rejecting it, because it was full of errors, misspellings, and bad interpretations. He further testified he shared this letter with Lane, but Lane ignored it.

22.     The true purpose of the DVD is to mask what Wealth Pools is really selling: investment contracts disguised as Associate memberships. Wealth Pools represents that along with the purchase of the Talk-N-Tutor DVD, investors receive an Associate membership and a separate public webpage on Wealth Pools' website with which to recruit other Associates. Investors can purchase a membership through the Wealth Pools' online application process, which requires that they electronically sign an independent Associate agreement setting forth the terms of the relationship.

23.     To induce investors to become Associates, Wealth Pools touts the prospect of earning significant income with minimal effort.  For example, promotional videos on its website state: "How would you like to double, triple, even quadruple your income or perhaps just free up some time to do the things you enjoy with the people you love?"  Wealth Pools claims the network marketing concept "has created thousands of millionaires" and "everyone can be a heavy hitter."  The testimonials purport to be from individuals who claim to have received earnings ranging from $600 to $60,000 a month while only expending minimal effort.  One individual claims to have earned $12,800 in one month without any effort.  Another individual claims he received $80,000 in two months and plans to "make over a million dollars over the next twelve months."

24.     No registration statement has been filed or has been in effect with the Commission in connection with the securities offered and sold by Wealth Pools.

**B.      The Investment Contracts Are a Security**

25.     The investment contracts the Defendants are offering and selling qualify as a security because investors in Wealth Pools make an investment of money in a common enterprise with the expectation of profits solely derived from the efforts of others.

26.     There are several ways investors are supposed to profit from their investment in Wealth Pools.  One way is that Wealth Pools claims to pay its Associates a share of the profits of the entire enterprise.   For each new Associate position Wealth Pools sells, it claims to evenly split $48 among four profit pools that members of each respective pool divide equally.   To qualify for these pools, Associates can purchase multiple DVDs.   The first pool requires an Associate to purchase five DVDs.  Pools two and three have progressively higher entry requirements.  Associates

can qualify for the highest pool, pool four, by purchasing approximately 100 to 150 Associate positions for $20,000 to $30,000.

27.     Once an Associate qualifies for a pool, he or she receives a share of the company's profits from that pool and any lower pools for life, according to Wealth Pools' website. In addition, for each Associate position an investor owns, he or she needs to pay an annual renewal fee of $50 per Associate position to continue to receive a share of the company's profits. Investors have to pay this renewal fee regardless of whether they still own the Talk-N-Tutor DVD.

28.     Hence, all an investor needs to do to allegedly receive passive income for life is make an initial investment of a little less than $1,000 to qualify for the first pool (depending on the time period of the investment, to qualify for all four pools an investor needed to spend between $20,000 to $30,000) and pay an annual renewal fee of $50 per Associate position. In other words, investors do not need to sell a single DVD or any other product and do not have to recruit any new Associates to receive a portion of Wealth Pools' profits for life.

29.     Associates may also qualify to receive passive income from the pools by having Wealth Pools recruit them new Associates through its "Marketing Assistance Program" ("MAP"). MAP was a telemarketing service Recruit for Wealth offered for $450 that Wealth Pools sold and promoted until July 2007. The service handled the Associates' selling, prospecting, and follow ups, thus freeing them from any involvement other than their initial investment.

30.     Wealth Pools touted the passive nature of the investment on its website with claims that there is "No Selling" required, and that an Associate can earn "monthly residual income for the rest of [their] LIFE with very little effort!!!" The MAP program information on Wealth Pools' website stated: "You will do NO SELLING! You will do NO PROSPECTING! You will do NO FOLLOW UPS!"

31.     Furthermore, Wealth Pools stated on its website that "we do 99% of the work and you will keep 100% of your [Wealth Pools] Commissions."

32.     In July 2007, Wealth Pools replaced the MAP service with a free version called the "Membership Assistance Program."  The company now assists Associates in recruiting up to five new members, which is sufficient to qualify for the first profit pool.

33.     Another way Associates are supposed to profit from their investment in Wealth Pools is to build marketing "downlines" by recruiting other prospective Associates to purchase the DVDs from Wealth Pools.  The act of recruiting new investors requires only minor effort by the Associates since the company handles virtually all of the work.  Associates need only refer prospective investors to the company's website or have them submit their information to the company's "intake department," which manually enters the investor's information into the system on their behalf.

34.     Wealth Pools is then responsible for closing the sale, collecting the payment, shipping the DVDs directly to the new Associate, establishing the new Associate's sales account, setting up the Associate's website, updating the referring Associate's sales records, and computing and distributing commissions.  In contrast, the referring Associates do not need to stock any inventory, complete any paperwork, close any sales, collect any money, or deliver any product.  In true pyramid scheme fashion, each time a new Associate is recruited, Wealth Pools pays $10 to each of the seven levels above the new recruit.

35.     Wealth Pools does not create incentives for Associates to sell the Talk-N-Tutor DVD to direct consumers.  For example, Wealth Pools does not pay commissions on sales to consumers; rather it pays commissions only for the "sale" of DVDs to new Associates.

36.     Moreover, it is impossible for Associates to profitably sell the DVDs to direct consumers.   Wealth Pools sells the DVDs to Associates at the full price and requires that Associates pay a $50 annual "renewal" fee for each DVD they purchase, according to the company's website. There is no exception to this renewal fee for DVDs even if the Associate no longer owns the DVD, since Associates must pay the fee to continue to receive commissions and profit payments beyond the first year.

37.     Associates often donate or simply store the DVD inventories they purchase to qualify for the pools.  One Associate who invested $200,000 in memberships donated many of her DVDs to colleges and used the others as business cards when recruiting new Associates. Another Associate in Bulgaria has thousands of DVDs in his house that are just sitting there.  In addition, Wealth Pools officials told some Associates they could simply give away the DVDs they receive to family members, and that they would make more money recruiting other Associates than trying to sell their DVDs.

38.     Wealth Pools also promotes its passive income opportunities rather than the DVDs.  Wealth Pools allows Associates to heavily promote the virtues of receiving passive income from building downlines and sharing in the profit pools.  For example, a "Puerto Rican Coordinator" hosted an offsite meeting in a banquet hall in Puerto Rico.   The meeting was entirely focused on the income opportunities from building downlines and sharing in the profit pools, and not the sales of the product.  The host gave a Power Point presentation on Wealth Pools to approximately 35 to 40 attendees, and represented there was no financial risk in becoming an Associate, and 97% of Wealth Pools' Associates were successful.  The presentation also included an explanation of the MAP program and stated the attendees should start planning

what to do with all the money they would receive. Only one of the approximately 26 Power Point slides mentioned Wealth Pools' product, and the host never showed the product.

## V.   MISREPRESENTATIONS AND OMMISSIONS

### A.   Wealth Pools is Pyramid Scheme

39.    Wealth Pools is a fraudulent pyramid scheme dependent on the recruitment of new investors, and which, by definition, will fail and leave the significant majority of investors with substantial losses. There is a finite number of prospective investors who could ultimately choose to invest, and when there are no more, Wealth Pools will collapse. Neither Robert Lane nor Wealth Pools disclose this material risk to investors.

40.    The Defendants know or are extremely reckless in not knowing the only way investors make money is if new investors are recruited because Wealth Pools is a massive pyramid and/or Ponzi scheme that is doomed to fail once the Defendants exhaust the finite number of new investors. This is demonstrated on the face of Wealth Pools' income statement sent to Associates, which shows that for the period of January 1, 2007 through August 31, 2007, Wealth Pools raised approximately $132 million. However, after commissions and operating expenses, the company had only $568,265 left over, which leaves insufficient funds to pay Associates income for life absent the eternal recruitment of new Associates.

### B.   The Defendants Falsely Claim that Associates Will Receive Income for Life

41.    Rather than disclose these facts, Wealth Pools materially misrepresents on its website that it is a "legitimate home based business" where 97% of its Associates make money. In addition, Robert Lane publicly denied Wealth Pools is a pyramid scheme.

42.    The Defendants also materially misrepresent that investors will receive income for life. Wealth Pools promises investors on its website "a lifetime of residual income that will change

your financial future forever!"   Additionally, Wealth Pools falsely claims on its website that investors can enjoy "a lifetime of residual income," and that "you can receive a monthly residual income for the rest of your LIFE with very little effort!!!"   For a short while, investors received outlandish rates of returns that exceeded more than 100% a year.   However, these payments have largely stopped, which will leave investors, especially those that invested late in the scheme, with huge losses.

43.   Moreover, in presentations by Wealth Pools' representatives to investors, Wealth Pools claimed that investors sharing in the pools profits would receive specific amounts each month for life, which would have resulted in returns of more than 100% per year, and that there was no financial risk.   In addition, on a publicly available website similar false claims were made.

44.   Lane also personally guarantees investors at Opportunity Meetings the profit pools will pay them forever. He also falsely tells investors at these meetings that the money they are suppose to receive is not based on future sales by claiming that "[y]ou just don't have to worry about that.  We have plenty of money to pay it, if for any reason the future sales don't."

45.   Defendants know or are extremely reckless in not knowing that claiming Wealth Pools investors will receive income for life is false.   Wealth Pools cannot pay its investors income for life, since its primary, if not exclusive, source of income is the recruitment of new investors rather than the sale of DVDs to consumers.   At its essence, Wealth Pools' business plan is analogous to an elaborate chain letter, when it exhausts the finite number of prospective investors and/or victims of their scheme, Wealth Pools will have no income to pay the promised returns for life.  In fact, Wealth Pools' former marketing director warned Lane in February 2006 that it was

mathematically impossible to make the payments he promises investors.  Yet, Lane allows this material misrepresentation to continue.

47.     Moreover, in promising investors residual income for life and that 97% of its Associates make money, the Defendants fail to disclose the dilutive effect new investors will have on the amount of money investors will receive from their investments.  Each new investor who joins the profit pools dilutes or saturates the interest of previous investors, because all qualified investors receive a share of the pool.  Defendants do not place a limit on the number of investors that can qualify for a pool; hence, any funds placed in the pool will be distributed among more and more investors.  Accordingly, the Defendants know or are extremely reckless in not knowing it is a material omission to not disclose the dilutive effect new investors will have on the investment in Wealth Pools.

**C.     The Defendants Failed to Disclose that one of Lane's Predecessor Companies Was Permanently Enjoined and Filed for Bankruptcy**

48.     The Defendants also fail to disclose that the State of Florida permanently enjoined and restrained one of Lane's predecessor companies, Winners' Circle, Inc., for similar business practices.  During October 1997, Winners' Circle was incorporated as a Florida corporation.  By April 1998, the Florida Attorney General accepted Winners' Circles' Assurance of Voluntary Compliance ("AVC"), executed by Lane, which permanently enjoined and restrained Winners' Circle from certain business practices.  Under the AVC, Winners' Circle was not allowed to offer compensation to any participant not based on the sale of products to consumers.  Notably, in this matter, Lane is once again offering compensation not based on the sale of products to consumers.

49.     The Defendants also do not disclose Winners' Circle filed for bankruptcy during 1999 after being incorporated in Florida for just two years.  This occurred shortly after the

Florida Attorney General's office filed a complaint against Lane, Winners' Circle, another Wealth Pools' executive, and others, alleging they were operating a pyramid scheme in violation of Florida Statute § 849.091(2) and had violated the AVC.

50.     Defendants know or are extremely reckless in not knowing that Lane's prior business filed for bankruptcy, and the State of Florida had permanently enjoined and restrained his prior business.

## VI.     LANE'S ROLE

51.     Lane controls Wealth Pools in nearly every conceivable way.  He is the 100% owner and president, has signatory authority over its bank accounts, approves nearly everything Wealth Pools does, and executes agreements and legal documents on its behalf.  Lane is also Wealth Pools promoter and public face, and appears on its website and extols its alleged virtues during a televised interview.

52.     Lane speaks at the "Opportunity Meetings" and other public forums about how Talk-N-Tutor is better than the competition and explains to investors the commission structure and profit pool arrangement.   He also emphasizes the importance of the profit pools and represents that once investors qualify, the profit pools will pay them forever without their having to make any more sales.  In addition, Lane has stated that Wealth Pools made millions of dollars in 2006 and will make millions more in 2007.

## VII.     DEFENDANTS AND RELIEF DEFENDANTS RECEIVED INVESTORS' FUNDS

53.     Wealth Pools has received investors' proceeds and deposited those funds in bank accounts Lane and his daughter, Renee Becker control.  In turn, these proceeds were used to make payments to Robert Lane, Julia Lane, Richard Lane, Renee Becker, T-N-T Education, Mundo Trade and First Fiduciary.  From April 2006 through August 2007, Wealth Pools paid:

(1) Robert Lane more than $230,000; (2) Julia Lane more than $430,000; (3) T-N-T Education more than $960,000; (4) Mundo Trade more than $300,000; and (4) First Fiduciary received more than $740,000. Based on incomplete bank records, Lane, his wife, and entities he controls have received at least $1.7 million of investors' funds.

## CLAIMS FOR RELIEF

## COUNT I

### Sale of Unregistered Securities in Violation of
### Sections 5(a) and 5(c) of the Securities Act

54. The Commission repeats and realleges paragraphs 1 through 53 of its Complaint.

55. No registration statement was filed or in effect with the Commission pursuant to the Securities Act and no exemption from registration exists with respect to the securities and transactions described in this Complaint.

56. The Defendants from at least August 2005 through the present, directly and indirectly, have: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise; (b) carried securities or causing such securities, as described in this Complaint, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and/or (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, as described in this Complaint, without a registration statement having been filed or being in effect with the Commission as to such securities.

57.     By reason of the foregoing, the Defendants have, directly and indirectly, violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (b).

## COUNT II

### Fraud in Violation of Section 17(a)(1) of the Securities Act

59.     The Commission repeats and realleges paragraphs 1 through 53 of its Complaint.

60.     The Defendants from at least August 2005 through the present, have directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

61.     By reason of the foregoing, the Defendants have directly and indirectly, violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Fraud in Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act

62.     The Commission repeats and realleges paragraphs 1 through 53 of its Complaint.

63.     The Defendants from at least August 2005 through the present, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint, have: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions,

practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

64.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

## COUNT IV

### Fraud in Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

65.     The Commission repeats and realleges paragraphs 1 through 53 of its Complaint.

66.     The Defendants from at least August 2005 through the present, have directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this Complaint, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

67.     By reason of the foregoing, the Defendants have directly or indirectly violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

## I.

### Declaratory Relief

Declare, determine and find that the Defendants committed the violations of the federal securities laws alleged in this Complaint.

## II.

### Temporary Restraining Order, Preliminary and
### Permanent Injunctive Relief

Issue a Temporary Restraining Order, a Preliminary Injunction and a Permanent Injunction, restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating: (a) Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c); (b) Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1); (c) Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3); and (d) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, thereunder, 17 C.F.R. § 240.10b-5.

## III.

### Asset Freeze and Accountings

Issue an Order temporarily freezing the assets of the Defendants and Relief Defendants until further Order of the Court, and requiring sworn accountings by the Defendants and Relief Defendants.

## IV.

### Appointment of a Receiver

Issue an Order appointing a Receiver over Defendants Wealth Pools International and Recruit for Wealth to marshal and safeguard all of said assets, and any other duties the Court

deems appropriate, and to prepare a report to the Court and the Commission detailing the activities of the Defendants and the whereabouts of investor funds.

## V.

### Records Preservation and Expedited Discovery

Issue an Order requiring the Defendants and Relief Defendants to preserve any records related to the subject matter of this lawsuit that are in their custody, possession or subject to their control, and to respond to discovery on an expedited basis.

## VI.

### Disgorgement

Issue an Order requiring the Defendants and Relief Defendants to disgorge all ill-gotten profits or proceeds that they have received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

## VII.

### Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## VIII.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## IX.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

December 5, 2007                    By: _Christopher E. Martin_

Christopher E. Martin
Senior Trial Counsel
martinc@sec.gov
Arizona Bar No. 018486
Direct Dial No.: (305) 982-6386
Facsimile No.:   (305) 536-4154

Trisha Sindler
Special Counsel
fuchst@sec.gov
Fla. Bar. No. 0773492
Direct Dial: (305) 982-6352

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154